**LEAGUE OF MARTIN, et al., Plaintiffs,**

**v.**

**CITY OF MILWAUKEE, et al., Defendants.**

**Civ. A. No. 81–C–1465.**

United States District Court,
E.D. Wisconsin.

June 8, 1984.

Barbara Zack Quindel, Curry First, Perry, First, Reiher, Lerner & Quindel, S.C., Milwaukee, Wis., for plaintiffs.

Grant F. Langley, City Atty. by Thomas E. Hayes, Reynold Scott Ritter and Thomas C. Goeldner, Milwaukee, Wis., for defendants.

D. Jeffrey Hirschberg, Whyte & Hirschboeck S.C., Milwaukee, Wis., for Milwaukee Police Ass'n.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

In these two consolidated cases, the United States and a certified class of private plaintiffs challenge the promotion, transfer, and assignment practices in the Milwaukee Police Department. Presently before the Court are: (1) the certified class' motion for approval of a proposed consent order; (2) counsel for the certified class's motions to withdraw as counsel for named plaintiffs Bobbie Durrah, Ronnie Horton, and Lenard Wells; (3) the certified class's motion to substitute the identity of one of the named plaintiffs; and (4) the certified class's motion to make available to the Court the defendants' police records and discovery documents previously submitted to the class. Additionally, the Court has been requested to sever these two cases so that the United States may proceed separately from the certified class. The cases

will be severed, and the motions will be granted, except for the class's motion to make available the defendants' police records and discovery documents, which will be granted subject to the limitations set forth in this decision and order.

## I.

### PROCEDURAL BACKGROUND

Civil Action No. 74–C–480 was filed on October 17, 1974, by the United States. The complaint alleged that the defendants had engaged in a pattern of racial discrimination in hiring, assignment, transfer, and promotion practices in the Milwaukee Police Department, in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.*, and provisions of the State and Local Fiscal Assistance Act, 31 U.S.C. § 1221 *et seq.* On July 25, 1975, the Court entered an interim order providing, in part, that for every three white applicants appointed to fill vacancies in the positions of police aide and patrol officer, two black applicants would also be appointed. This order presently remains in effect.

In the spring of 1979, the Office of Revenue Sharing conducted an investigation of the Milwaukee Police Department. The results of the investigation formed the basis of an August 1979 preliminary determination that the Milwaukee Police Department had failed to comply with a provision of the Revenue Sharing Act prohibiting recipients of revenue sharing funds from engaging in discriminatory practices. The Office of Revenue Sharing determined that the City of Milwaukee ("the City") had used promotion selection procedures and had engaged in assignment practices that adversely affected the employment opportunities of black police officers. These procedures and practices were not shown to predict job performance or to be required by business necessity. Pursuant to a voluntary compliance agreement, the City began to provide the Office of Revenue Sharing with detailed annual reports covering, *inter alia*, assignment and promotional data.

On November 19, 1981, an organization of black police officers called the League of Martin ("the League") and several individual black officers filed Civil Action No. 81–C–1465 against the City, the Milwaukee Police Department, the Milwaukee Police and Fire Commission, and several individuals holding positions of authority within the Police Department. The complaint alleged that the defendants had engaged in discriminatory practices with respect to assignments, transfers, promotions, and working conditions within the Police Department, in violation of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1870, 42 U.S.C. § 1981. The individual plaintiffs further alleged that the defendants had unlawfully retaliated against them for exercising their first and fourteenth amendment rights. The individual claims were based on 42 U.S.C. §§ 1981, 1983, 1985(2) and (3), 1988 and 2000e–5(f)(2), and the due process clause of the fourteenth amendment. These claims of retaliation came before the Court on the plaintiffs' motion for a preliminary injunction on February 11–19, 1982. In a decision and order dated May 14, 1982, I held that the individual plaintiffs had established that they had been retaliated against for engaging in activity protected by the first amendment.

On May 24, 1982, the Court certified that Civil Action No. 81–C–1465 be maintained as a class action. The class certified consists of all black persons who are presently City of Milwaukee police officers, or who in the future will be City of Milwaukee police officers, and who have been or will be subjected to racially discriminatory practices in assignments, promotions, discipline, and working conditions by the defendants. The plaintiffs League of Martin, Arthur Jones, Bobbie Durrah, Brian Suttle, Ronnie Horton, Lenard Wells, and Jane Doe were designated as the class representatives. Certification was made pursuant to Fed.R. Civ.P. 23(b)(2).

Meanwhile, the United States renewed its investigation of assignment and promotion practices within the Milwaukee Police

Department. The Assistant Attorney General thereafter determined that the defendants' assignment of officers to the Tactical Enforcement Unit ("the Tac Squad") of the Milwaukee Police Department unlawfully discriminated against blacks. On September 3, 1982, the United States filed a motion for supplemental relief. The United States therein requested an order establishing an objective, job-related procedure for assignments to the Tac Squad that did not adversely affect black applicants. Extensive discovery was undertaken in the following months.

On September 17, 1982, the plaintiffs in Civil Action No. 81–C–1425 moved to intervene in Civil Action No. 74–C–480. This motion was superseded by a motion to consolidate the two actions filed September 27, 1982. Neither the defendants nor the United States opposed the motion to consolidate. Because the actions posed common questions of fact and law, the motion to consolidate was granted on January 7, 1983. A schedule for discovery and trial was established in an order dated February 1, 1983.

On May 18, 1983, the United States filed a second motion for supplemental relief, based on the Assistant Attorney General's determination that promotion procedures and assignments to and within the several geographic districts of the Milwaukee Police Department violated Title VII of the Civil Rights Act of 1964. The certified class joined in this motion.

During this period, the parties were engaged in discovery. Objections to the discoverability of certain police records prompted the certified class to file several motions to compel discovery and to modify the Court's scheduling order. The parties subsequently reached an agreement that the defendants' six-month personnel evaluation ratings for police department employees promoted from the 1981 sergeant's list and the defendants' personnel promotional evaluation forms known as "PP–41's" should be kept confidential. These two groups of documents were the subjects of protective orders entered on August 18,

1983 and September 28, 1983, respectively. These orders supplemented an order dated February 25, 1983, which rendered confidential the defendants' promotional examination documents. The remaining discovery disputes were thereafter resolved, and the discovery motions were dismissed as moot on October 25, 1983.

The possibility of settling this dispute was first discussed among the parties and the Court at a status conference on August 26, 1983. At that time the United States indicated that it had reached a tentative agreement with the defendants. It was agreed that on or before November 1, 1983, the defendants would inform the court of any progress towards settlement between the certified class and the defendants, and indicate whether a final pretrial conference would be necessary.

Despite the efforts of counsel to negotiate settlement between the City and the certified class, a number of events impeded their progress. On September 15, 1983, named plaintiff Brian Suttle, a ten-year veteran police officer, was fired by defendant Police Chief Harold Breier. On October 27, 1983, Earl Ridgway, a thirteen-year veteran police officer and a board member of the plaintiff League of Martin, was fired by defendant Breier. On November 3, 1983, David Clarke, a black police officer with five years on the police force, was fired by defendant Breier. On the same day, named plaintiff Ronnie Horton, who had received injunctive relief in the Court's order of May 14, 1982, was interrogated regarding an off-duty matter and was threatened with disciplinary action. The plaintiffs regarded these actions as retaliative and filed a motion for a temporary restraining order on November 10, 1983. They requested that the Court enjoin the defendants from terminating, or coercing resignations from, any nonprobationary black police officer unless approval of termination was first obtained from the Court.

The Court held a settlement conference on November 16, 1983. At that time, counsel for the certified class indicated that they had participated in settlement discus-

sions with the defendants and the United States, but that the firings of the black officers had brought settlement talks to a standstill. All parties emphasized that they wished to settle the case, but that they had been unable to reach an accord on any of the matters in dispute. The Court suggested that Mr. Zel Rice II act as a Special Master to assist the parties' settlement efforts. The parties agreed that Mr. Rice's assistance would be beneficial, and that they would resume negotiations under his direction. The matters raised in the motion for a temporary restraining order were left unresolved at that time.

On November 18, 1983, the Court appointed Mr. Rice as Special Master for the purpose of negotiating a settlement. The parties agreed to set aside two weeks for negotiation.

At this juncture, counsel for the certified class recognized the importance of having a negotiating team present at the settlement negotiations to assist the attorneys. On November 22, 1983, named plaintiff Arthur Jones, president of the League of Martin, mailed a letter to all League members and black officers requesting their attendance at a meeting to be held November 26. The letter emphasized the importance of the meeting and urged the recipients to attend.

On the day of the meeting, the League's Board of Directors and the class's attorney met at Jones' home. At this time, the Board selected a five-person negotiating committee. The committee consisted of named plaintiffs Arthur Jones and Lenard Wells and also Verbie Swanigan, William Wade, and John Wesley. Later, at the meeting, Jones indicated that these five persons had been approved by the Board to serve as a negotiating team, and directed any persons opposing the proposed negotiating team to voice their objections. A motion to approve the five-person team carried, and two alternates were selected.

Negotiations with the Special Master began on November 28, 1983. Over the following two weeks, the parties exchanged written proposals and counterproposals until a particular issue had been thoroughly

discussed and an agreement reached. When the attorneys, the negotiating team, and the Special Master were not all meeting together, there would be individual caucuses by the parties. At the conclusion of negotiations on December 8, 1983, the parties had reached an agreement in principle on all issues. At this time, the language of the consent order had not been agreed upon. However, the parties decided that the proposed order should be made public, and a copy was filed with the Court on December 15, 1983.

That same day the Milwaukee Police Association and the Milwaukee Police Supervisor's Organization ("the Unions") filed a motion to intervene. They also contacted the parties and submitted written changes in the proposed consent order that reflected their concerns. The parties all rejected the Union's proposed changes, and the Unions filed a complaint with the Wisconsin Employment Relations Commission on February 6, 1984.

During this time, all of the parties agreed with the Unions to stipulations resolving the Union's motion to intervene. The stipulations included a provision that no reverse racial discrimination claims would be made if the Unions were permitted to intervene. The stipulations were approved by the Court on January 25, 1984.

On January 3, 1984, counsel for the defendants caused to be introduced in the City of Milwaukee Common Council, File No. 83–1849, a resolution for approval of the proposed consent order. The matter was scheduled to go before the Common Council Judiciary and Legislative Committee on January 16, 1984. However, on January 13, 1984, counsel for defendants requested that the matter be removed from the agenda in view of the United States' unexpected proposed changes in the language of the consent order.

On January 25, 1984, the private class and the defendants filed a superseding copy of the proposed consent order containing the language changes. A comparison of the proposed order filed December 15, 1983, with the superseding copy indicated

that the language changes were nonsubstantive.

On January 26, 1984, counsel for all the parties and the Special Master met with the Court in a status conference. At that time the United States indicated that it still had language problems with the proposed consent order, and that further suggestions for changes could ensue. The Court advised the parties that a fairness hearing should be held so that members of the class and the public could have an opportunity to present their views on the proposed consent order. It was agreed that a notice of the fairness hearing would be sent out to class members one to two days after the City Common Council meeting on February 14, 1984, and that the defendants would arrange for a copy of the notice to be published in a local newspaper on February 18, 1984.

On February 3, 1984, a letter was mailed to all members of the League, informing them of a meeting to be held on February 11, 1984. The purpose of the meeting was to discuss the proposed consent order and to elect the new officers of the League of Martin.

At the meeting, counsel for the certified class and the members of the negotiating team described the negotiation process and the provisions of the proposed consent order. Plaintiff Arthur Jones, president of the League and a member of the negotiating team, spoke generally in favor of the proposed consent order. Plaintiff Lenard Wells, also a member of the negotiating team, spoke in opposition to the proposed consent order. There was no vote on ratification of the proposed consent order, nor was there any vote to approve, disapprove, or amend it.

After discussion of the proposed consent order, there were nominations for president of the League of Martin. The nominees were the incumbent Arthur Jones and Vice-President Lenard Wells. By secret ballot, Arthur Jones was re-elected.

On February 14, 1984, this case was discussed before the City Common Council's Judiciary and Legislative Committee.

Plaintiff Lenard Wells addressed the committee and identified himself as a member of the League of Martin's negotiating team and as a named plaintiff. He told the committee that he was disassociating himself from the settlement effort, and expressed his opinion that the proposed consent order did not offer remedies for the class allegations of racial discrimination. When queried by an alderman, Wells stated he was aware that the proposed consent order contained an enforcement provision respecting testing and promotion procedures.

On that same date, the City of Milwaukee Common Council approved a resolution accepting the proposed consent order on behalf of the defendants.

Notice was thereupon given to the class members that this case would come before the Court for a fairness hearing on April 5, 1984. Persons seeking an opportunity to express their views on the proposed consent order were instructed to mail or deliver written objections to the Clerk of Court sufficiently early so that all objections would be received by March 30, 1984. The notice also provided that anyone filing an objection would be given an opportunity to be heard at the fairness hearing, and that persons wishing to be heard could appear with or without the assistance of counsel.

The court thereafter received forty written statements and requests to be heard. Several of these submissions bore multiple signatures. Indeed, a submission by plaintiffs Lenard Wells, Ronnie Horton, and Bobbie Durrah is accompanied by a list of one hundred six signatures, although some of these latter signers filed individual statements. Seven persons filed requests to speak in favor of the proposed consent order, two persons filed requests that did not disclose their opinions on the matter, and the remaining persons submitted objections.

The fairness hearing began on Thursday, April 5, 1984, and lasted two days. At the outset, the Special Master gave an overview of the negotiation efforts and the

results the parties had obtained. Afterwards, counsel for the parties gave their several reports, explaining the provisions of the consent order with reference to case law and the Uniform Guidelines on Employee Selection Procedures. Thereafter, the persons filing statements took their turns voicing their objections to, or support of, the proposed consent order. At the close of the hearing on April 6, the Court stated that Civil Action Nos. 74–C–480 and 81–C–1465 would be severed. The Court also gave all the parties and interested persons until April 20, 1984, to file additional materials with respect to the proposed consent order. The matter has been under advisement since that date.

## II.

### SEVERANCE OF THE ACTIONS

During the course of the parties' settlement efforts, the Special Master advised the Court that the United States, through the Civil Rights Division of the Department of Justice, had several nonsubstantive disagreements with the language in the proposed consent order filed January 25, 1984. Those disagreements have continued up to the present. While it is not altogether clear why these matters could not have been resolved prior to the fairness hearing, it would be unwise to delay decision on the certified class's and defendants' motion for approval of the proposed consent order. The fact that the United States' disagreement is purportedly over nonsubstantive matters eliminates the risk of a subsequent collateral challenge. The better approach is to proceed to the merits of the private class's, the defendants', and the objectors' contentions with respect to the proposed order submitted on January 25.

■ Because the United States does not agree with the proposed consent order presently under review, and because none of the parties has objected to severance, the United States' action will be severed from the private class action. Accordingly, Civil Action Nos. 74–C–480 and 81–C–1465 are severed.

## III.

### MOTIONS TO WITHDRAW AS COUNSEL FOR PLAINTIFFS BOBBIE DURRAH, RONNIE HORTON, AND LENARD WELLS

Attorneys Curry First and Barbara Zack Quindel, counsel for the certified class, have moved to withdraw as counsel for plaintiffs Bobbie Durrah, Ronnie Horton, and Lenard Wells. The basis for the motion is that these plaintiffs have decided to object to the proposed consent order and prosecute the lawsuit against the defendants. Thus, there is a direct conflict between these plaintiffs and the plaintiffs and class members who support the proposed consent order.

■ The court has general supervisory power of the attorneys certified to represent the class in a class action. *See Piel v. National Semiconductor Corp.,* 86 F.R.D. 357, 366 (E.D.Pa.1980). Additionally, counsel for the class have a duty to notify the court of any conflicts of interest among class members that arise during litigation. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1176 (5th Cir.1978); *National Ass'n of Regional Medical Programs v. Mathews,* 551 F.2d 340, 346 n. 1 (D.C.Cir. 1976), *cert. denied,* 431 U.S. 954, 97 S.Ct. 2671, 53 L.Ed.2d 270 (1977). Class counsels' loyalty extends not merely to the named plaintiffs or, for that matter, merely to absentee class members. Because a large class of persons is likely to include members with divergent concerns, the court should be apprised of conflicts so that steps may be taken to insure that the divergent concerns are protected.

■ The Court is satisfied that the fairness hearing procedure established in this case sufficiently protects the aforenamed objectors' interests, and attorneys First and Quindel should no longer be required to represent them. Their motions to withdraw are granted *nunc pro tunc* April 5, 1984.

## IV.

### MOTION TO SUBSTITUTE IDENTITY OF NAMED PLAINTIFF DOROTHY DOWNING FOR JANE DOE

When Civil Action No. 81–C–1465 was filed, the plaintiffs filed a motion for permission to use the fictitious name Jane Doe for one of the plaintiffs. Plaintiff Dorothy Downing believes that there is no longer any basis for using this pseudonym, and has moved for leave to proceed as a named plaintiff under her true identity. This motion will be granted.

## V.

### MOTION TO MAKE AVAILABLE TO COURT DEFENDANTS' POLICE RECORDS AND PRETRIAL DISCOVERY MATERIALS

■ The certified class has moved for leave to file three large boxes of materials submitted to the class by the defendants during the course of discovery. The basis for this motion is that the Court may find some of the information pertinent to the issues of whether the case against the defendants is sufficiently strong to prompt approval of the proposed consent order, and whether the proposed consent order is fair, reasonable, and adequate.

The motion will be granted in part. While many of the documents in question are no doubt highly relevant to the issues cited, matters that are made available to the Court are generally filed with the Clerk of Court and are matters of public record. Thus, any of the documents proposed to be made available to the Court would also become available for public inspection. As the defendants correctly argue, some of the materials are personnel files that are subject to protective orders and should not be made public. Therefore, the motion will be granted only insofar as it is consistent with protective orders previously entered in this case. The discovery materials will be made generally available, except for those which are subject to a protective order. These latter documents will remain under seal.

## VI.

### CERTIFIED CLASS'S MOTION FOR APPROVAL OF PROPOSED CONSENT ORDER

On April 5, 1984, the certified class filed a motion for approval of the proposed consent order, and argued in support of its motion during the fairness hearing. The Court has reviewed the class' submissions and the statements and submission of the objectors, and determines that the proposed consent order should be approved.

■ The requirement of judicial approval of the proposed consent order derives from Fed.R.Civ.P. 23(e), which provides:

> **Dismissal or Compromise.** A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

The fundamental issue to be resolved in approving a class action settlement is whether, regarded as a whole, the settlement is "fair, reasonable and adequate." *Armstrong v. Board of School Directors,* 616 F.2d 305, 313 (7th Cir.1980). The analysis is divided into seven discrete inquiries respecting: (1) the strength of the plaintiff's case on the merits balanced against the amount offered in settlement; (2) the opinion of counsel on the fairness of the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) whether there was collusion between the parties in reaching the settlement; (5) the length, complexity, and cost of further litigation; (6) the defendants' ability to pay; and (7) the reaction of class members to the proposed settlement and their opposition, if any, to the settlement terms. The first factor is generally regarded as the most important.

The Court undertakes these inquiries with an eye to the public policy favoring voluntary resolution of litigation through settlement. "In the class action context in particular, 'there is an overriding public

interest in favor of settlement.' " *Id.* at 313, *quoting Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977).

■ Nonetheless, the Court is not free to modify the terms of a proposed settlement agreement. The Court may either grant a motion for approval and adopt the settlement as an order of the Court or reject it in its entirety. There is no occasion to set aside certain provisions of the settlement agreement and replace them with provisions of the Court's own device, even though the Court's substitutions might be in accordance with case law and beneficial to all concerned. The Court simply accepts or rejects the agreement as it is presented. *See Wattleton v. Ladish Co.,* 89 F.R.D. 677, 680 (E.D.Wis.1981). With this in mind, I turn to the proposed consent order and the certified class's argument in support thereof.

1. *The Strength of the Plaintiffs' Case Balanced Against the Amount Offered in Settlement*

■ The plaintiffs' claims of liability are predicated on 42 U.S.C. §§ 1981, 1983, and 2000e–5, and the fourteenth amendment. In order to prevail on their claims under 42 U.S.C. § 1981 and 1983 and the fourteenth amendment, the plaintiffs must show that the defendants' actions were undertaken with discriminatory intent. *See General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 383–391, 102 S.Ct. 3141, 3146–3150, 73 L.Ed.2d 835 (1982); *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Mescall v. Burrus,* 603 F.2d 1266, 1270 (7th Cir. 1979). Proof of discriminatory intent is also required in actions under 42 U.S.C. § 2000e–5 where the plaintiff alleges disparate treatment, although in some instances it may be inferred from a showing of disparate treatment. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

■ By contrast, plaintiffs alleging that a facially neutral employment practice has a disparate impact on a protected group in violation of 42 U.S.C. §§2000e–2 and 2000e–5 need not show discriminatory intent. To state a prima facie case, the plaintiffs need only show that the practice results in a significantly adverse statistical impact on the protected group. *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). Once a prima facie case is shown, the burden shifts to the employer to demonstrate that the practice under attack is justified by a legitimate relationship to the employment in question. The plaintiff may rebut this showing with proof that an alternative practice would also serve the employer's legitimate interests without a disparate effect. *Id.*

Although the defendants have not conceded liability on any of the plaintiffs' claims, the plaintiffs have stated a prima facie case of disparate impact. Based on the parties' stipulations of fact, and other submissions and previous hearings in this matter, the Court finds that the plaintiffs have demonstrated an adequate likelihood of succeeding at trial.

The first matter of concern to the parties is the issue of promotions to so-called "nonexempt" positions. These are called nonexempt positions because persons wishing to be promoted thereto are required to undergo an examination procedure. These positions are the positions of detective, sergeant, lieutenant of police, and lieutenant of detectives.

For all years relevant to this action, police officers seeking promotion to nonexempt positions were selected according to procedures promulgated and administered by the defendant Milwaukee Fire and Police Commission ("the Commission"). To be eligible to compete for promotion to nonexempt positions, a candidate must be a nonprobationary police officer with a certain number of years of service in a particular classification. For example, to be eligible for promotion to sergeant, a candidate must have at least four years of service as a police officer. For purposes of promotion to sergeant and detective, candi-

dates may gather credits in academic course work as an alternative to fulfilling a portion of the time requirement.

All candidates must initially pass a written examination, which serves as a threshold screening device. The procedures following examination have varied in the past but have generally consisted of: (1) either an oral interview or an "assessment center"; (2) a departmental or efficiency rating; and (3) a seniority rating. The assessment center is a series of exercises purportedly designed to simulate the job duties of the position for which a candidate has applied. The departmental or efficiency rating is given by the defendant Chief of Police. The Chief appoints five high rank-ing police officers from within the Police Department to a panel. Supervisors of the candidates prepare PP–41 performance evaluation forms, which are forwarded to the appointed panel. The panel reviews the candidates' PP–41s and personnel files. On the basis of their review, each member of the panel gives the officer a numerical score. The average of the scores becomes the candidate's departmental rating, which is submitted to the Chief.

The scores on the several components are compiled into a composite score. The weight accorded to each component of the procedure has varied during the years in question as the following chart indicates:

| Rank | Year | Written/Oral Examination | Assessment Center | Department Rating | Seniority |
|------|------|--------------------------|-------------------|-------------------|-----------|
| Detective | 1977 | 25% / NA | 35% | 30% | 10% |
| Sergeant | 1977 | 30% / 20% | 15% | 30% | 5% |
| Lt. of Det. | 1977 | 40% / 20% | NA | 30% | 10% |
| Lt. of Det. | 1980 | 40% / NA | 30% | 20% | 10% |
| Det. | 1981 | 20% / NA | 40% | 30% | 10% |
| Sergeant | 1981 | 28% / NA | 37% | 30% | 5% |

The composite scores are arranged on an eligibility list. Promotions are made from the eligibility list, as vacancies arise, with the first vacancy going to the highest rank-ing candidate on the list.

There are presently one hundred fifty-six sergeants in the Police Department, seven of whom are black. During the period relevant to this action, there have been two examinations for promotion to sergeant, in 1977 and 1981. An expert statistician for the certified class, Dr. J.L. Stebbins, re-viewed the numbers of black and white officers who were tested, who passed, and who were promoted. He also compared the passing and selection rates of black candi-dates with those of white candidates, and concluded that the selection rates for black officers in the two sergeant examinations violated the four-fifths rule established in the Uniform Guidelines on Employee Selec-tion Procedures ("Uniform Guidelines"), 29 C.F.R. § 1607.4D.[1] With respect to black

---

1. 29 C.F.R. § 1607.4D provides in pertinent part:

 *Adverse impact and the "four-fifths rule."* A selection rate for any race, sex, or ethnic group which is less than four-fifths ($\frac{4}{5}$) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selec-tion rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants dis-proportionately on grounds of race, sex, or ethnic group. Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant, or where special recruiting or other programs cause the pool of minority or female candidates to be

candidates' written test scores, Dr. Stebbins further found a statistically significant difference in the mean scores of the black candidates as compared to the white candidates.[2] His report was filed with the court on August 25, 1983.

There are two hundred thirty-six detectives in the Police Department, fourteen of whom are black. As with the police sergeants, the examinations relevant to this provision were administered in 1977 and 1981. Prior to 1977, only those officers who had been assigned to special plainclothes duty and had served one year as acting detective in the Detective Bureau were eligible to take the detective examination. This practice was eliminated in 1977, and a method was established whereby acting detectives could waive the written test portion of the selection procedures for the alternative of automatic receipt of a base score of seventy in the written test plus additional points awarded on the basis of seniority.

Dr. Stebbins again compared data with respect to the black and white candidates for detective, although he did not analyze data with respect to those acting detectives who elected to take the base score rather than the written examination. Dr. Stebbins's report once again shows a violation of the Uniform Guidelines' four-fifths rule, and a statistically significant disparity between black candidates' and white candidates' test scores in both years.

There are twenty-three lieutenants of detectives in the Police Department, none of whom are black. Dr. Stebbins's review of the passing and selection rates for examinations for this position led him to conclude that the procedures violated the four-fifths rule.

There presently are twenty-five lieutenants of police in the Police Department, none of whom are black. Examinations for this position were administered in 1977 and 1982. The 1977 selection rate for white candidates was six percent as compared to zero percent for black candidates. With respect to the 1982 examination, three of the four black candidates passed the examination, and it is projected that one of these will be promoted to lieutenant of police. Dr. Stebbins did not submit conclusions with respect to this position.

The certified class also retained the services of Dr. James L. Outtz, an industrial psychological expert. His report, which was also filed on August 25, 1983, contained four major findings with respect to nonexempt promotions:

(1) The 1981 and 1977 written tests for the position of Police Detective have not been demonstrated to be content valid. Neither test was developed on the basis of a proper job analysis. Both tests contain a significant number of invalid items and both were used in a manner that was not justified under the Uniform Guidelines.

(2) The 1981 and 1977 written tests for the position of Police Sergeant have not been demonstrated to be content valid. Neither test was developed on the basis of a proper job analysis. Both tests contain a significant number of invalid items and both were used in a manner that was not justified under the Uniform Guidelines.

(3) The Departmental Ratings used in conjunction with the written tests

---

atypical of the normal pool of applicants from that group. Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact.

**2.** Under 29 C.F.R. § 1607.14B(5), a selection procedure will be regarded as related to job performance criteria for purposes of the Uniform Guidelines when the relationship between performance on the procedure and performance on the criterion measure is statistically significant at the .05 level of statistical significance, which means that it is sufficiently high as to have a probability of no more than one in twenty to have occurred by chance. Dr. Stebbins used the .05 standard in arriving at his conclusions.

above were highly subjective, non-standardized and have not been demonstrated to be content valid.

(4) The requirement of a specified number of years of service in the next lower position in order to be promoted to the positions of Detective, Police Sergeant, Lt. of Detectives and Lt. of Police is arbitrary, without job related foundation and has not been demonstrated to be valid.

■ While a finding of a violation of the Uniform Guidelines is not dispositive of the issue of liability, it is entitled to great deference. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975). Under the Uniform Guidelines, a selection rate for protected groups which is less than four-fifths of the rate for the group with the highest rate is evidence of adverse impact, so the burden shifts to the employer to establish validity. In this case, Dr. Stebbins's report was offered in support of the contention that the promotion procedures for nonexempt positions violate the four-fifths rule, and Dr. Outtz's report is offered to rebut any contention that the procedures are valid. Thus, the record presently supports the conclusion that plaintiffs could succeed on a claim of disparate impact under 42 U.S.C. § 2000e–5 with respect to the nonexempt positions of sergeant, detective, and lieutenant of detectives.

Paragraphs 6 through 23 of the consent order cover promotions to nonexempt positions. The order forbids the defendants to use the current selection procedures for sergeants and detectives. It provides that the Commission must modify the existing components of the procedures for these two positions so that they conform to the Uniform Guidelines.

■ In one respect, this relief goes somewhat beyond the relief that the plaintiffs might receive if they prevailed at trial. Some courts have implicitly held that where promotion depends upon the cumulative results of several tests, the procedure as a whole has a discriminatory impact and must be dispensed with in its entirety. *See, e.g., Kirkland v. Department of Corrections,* 520 F.2d 420, (2d Cir.1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). However, a court in this circuit has required that only so much of a multipartite procedure as can be shown to have a disparate impact need be revised. *United States v. City of Chicago,* 411 F.Supp. 218, *aff'd,* 549 F.2d 415 (7th Cir. 1976), *cert. denied sub nom Arado v. City of Chicago,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). The proposed consent order resolves this legal conflict in the plaintiffs' favor because new promotion procedures must be devised, even though it has not been shown that the existing subparts each have an adverse impact on the certified class.

By contrast, the proposed consent order does not include a prohibition on continued use of the procedures for selecting lieutenants of detective, and in this respect, the order falls short of what plaintiffs might receive were they to prevail at trial. This concession marks a compromise in the negotiations. Apparently, the defendants were prepared to challenge Dr. Stebbins's conclusions in this regard because the sample for analysis was too small to yield accurate results. Nonetheless, the proposed consent order does provide for continued scrutiny of such procedures as are followed in the future, so that appointments may be stayed if it is determined that the procedure has an adverse impact.

The proposed consent order also eliminates any procedural delays that might result from charging either party with the sole responsibility of promulgating new procedures by providing for the appointment of a mutually agreed upon testing expert who will consult with the Commission in developing and administering the new procedures. The order permits the plaintiffs to challenge the testing expert's work product within a specified period if it appears that the testing expert's analyses do not conform to the Uniform Guidelines, and to challenge the testing administration if it appears that the Commission has not

followed the expert's recommendation. The Court finds that the relief with respect to promotions to nonexempt positions is adequate when viewed in light of the strength of plaintiffs' case.

The second matter covered by the proposed consent order is the individual relief in the context of nonexempt promotions. The parties acknowledge that numerous black officers took the examinations for promotion to sergeant and detective, but they were not promoted. They also recognize that development of the new procedures will take time.

The plaintiffs entered the negotiation process seeking the same percentage of black persons among the ranks of sergeant and detective as exists among the ranks of police officer; that is, nine percent. They contended that nine percent of the positions of sergeant and detective would be held by black persons absent a discriminatory promotional procedure.

The defendants, while not conceding that there had been discrimination, argued that the appropriate figure to use in fashioning a remedy was 6.4 percent. According to the defendants, this figure represents the percentage of black officers who met the eligibility requirements for promotion to sergeant and detective using a minimum of three years of service requirement.[3]

Paragraphs 23 through 30 of the proposed consent order provide for promotions of certain black officers. The numbers agreed upon reflect a compromise between the parties.[4] With respect to the promotions to sergeant, the order provides that officer Verbie Swanigan will be promoted to fill the next vacancy among the sergeants and will receive back pay and retroactive seniority. The order also creates a pool from which three other sergeants will be selected. Of these three, the first two to be selected will be officers who passed the 1981 examination without the addition

of a constant reflecting the difference in the mean scores of white and black officers taking that examination. Officers qualifying under this standard will be required to take a special assessment center exercise administered by the Commission. The Commission will select from those officers successfully completing the exercise two officers to fill the two vacancies following Swanigan's promotion. The third officer to be promoted shall be promoted on the basis of his composite score under the new procedures to be established by the expert and the Commission. If the procedure for promoting the first two officers does not result in two black officers becoming available for promotion to sergeant, then the first two will be selected in the same manner as the third. The three officers so appointed will receive retroactive seniority. Finally, those officers who took the written examinations for sergeant in 1977 or 1981 and who have not been promoted to sergeant and who will not be so promoted under the order are entitled to share in a special monetary relief pool.

Promotions to detective are the subject of paragraph 26 of the proposed consent order. The defendants agree therein to select the five highest scoring black police officers from the 1981 detective eligibility list who are available when vacancies occur. The order also establishes a second special relief monetary pool for those officers who took the 1977 or 1981 written examination for detective, and who were not promoted to either sergeant or detective and who will not be so promoted under the order. The five officers who are promoted will be given retroactive seniority.

Paragraph 27 covers promotions to lieutenant of police. This paragraph simply provides that the current eligibility list for this position shall be extended to insure appointments through the eighth party on that list.

---

3. The time requirements for these periods are four and five years, respectively. The defendants proposed a three-year figure in view of plaintiffs' challenge to the eligibility requirement.

4. It should be noted that the United States has not taken a position on this issue.

Paragraphs 28 through 30 establish a procedure for promoting certain officers to lieutenant of detectives. First, the parties agree that Darrell Rodgers, the highest ranking black detective on the 1980 eligibility list who did not receive a promotion shall be appointed to the next vacancy among the lieutenants of detectives. Plaintiff Arthur Jones shall be promoted to fill the next vacancy, provided he passes all the components of the next lieutenant of detectives' examination. Additionally, Johnnie L. Smith, the remaining black detective on the 1980 eligibility list, will receive the total back pay award from a third special monetary relief pool, unless Arthur Jones fails a component of the lieutenant of detectives' examination. In that case, Johnnie Smith would be the next to be promoted to lieutenant of detectives, and the award from the special monetary relief pool would be paid into a compensatory relief pool for the benefit of the class members.

 Interim relief in the form of numerical goals and accelerated promotion of minority persons from among qualified applicants is both constitutional and appropriate to compensate for discriminatory employment practices. *See United States v. Chicago,* 411 F.Supp. at 242. In this case, the proposal provides numerical goals for certain positions within the Milwaukee Police Department, which will be met depending in part on the availability of qualified personnel. The Court finds that this form of relief is appropriate in this case.

 The third item covered in the proposed consent order is the issue of procedures and relief with respect to miscellaneous exempt positions. These positions are generally within specialized bureaus, such as the Identification Bureau or the Bureau of Communications. Promotions to these positions are presently exempt from the examination process. The promotions are made by the Chief of Police and are approved by the Commission. Most persons promoted to these positions are police officers previously assigned to particular specialized bureaus. As an assignee, the po-

lice officer learns the skills necessary to be qualified for the exempt promotion.

Of the one hundred nine officers holding miscellaneous exempt positions in the Police Department, only one is black. Between the years of 1975 and 1981, there were ninety-one promotions to miscellaneous exempt positions, but only one of these went to a black officer. There are no uniform procedures or standardized criteria for assigning police officers to the special bureaus. The decision rests solely with the Chief of Police, and there has been no posting of vacancies when there are positions in these bureaus to be filled.

The total exclusion of black officers from all but one of these positions, the subjectivity of the assignment process, and the closed nature of the selection procedure persuade the Court that the plaintiffs could prevail on claims of disparate treatment and disparate impact with respect to the miscellaneous exempt positions. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 1858 n. 23, 52 L.Ed.2d 396 (1977).

The proposed consent order responds to this problem in paragraphs 31 through 33 and paragraph 38. The Commission has agreed to retain an expert to determine whether certain positions should remain exempt. With respect to those positions that remain exempt, the Commission confers with the expert and modifies the qualifications for that position to insure the qualifications are job related. Thereafter, all appointees to that position must meet the qualifications. Paragraph 33 creates a pool of black officers who qualify for the positions and who have service dates of January 1, 1982, or earlier. Vacancies in the exempt positions will then be filled with officers selected from this pool, although the Commission is not required to fill more than twenty-five percent of the vacancies with officers selected from the pool. Finally, the parties agree that a black person shall be appointed to the next vacant police officer, sergeant, or detective position in each of several specified bureaus. In view

of the fact that there are almost no blacks in any of these special exempt positions, and in the absence of any plausible explanation for this disparity, the Court determines that this form of relief is entirely appropriate.

The fourth problem to be resolved by the proposed consent order involves departmental assignments. This includes assignment to the Tac Squad and assignments to the Police Department's geographic districts.

■ The Tac Squad (Tactical Enforcement Unit) was established by Police Chief Breier in 1967. It currently has approximately seventy-six officers assigned to it. At the time Civil Action No. 81–C–1465 was filed, no black officer had ever been assigned to the Tac Squad. In August 1982, two black officers were assigned to the Tac Squad for the first time. Officers regard an assignment to the Tac Squad as an opportunity for upward mobility in the Police Department.

The proposed consent order fashions a procedure for Tac Squad assignments. Applicants may submit a written application to their District Commanders no more than once per year. The commanding officer issues a recommendation with respect to each applicant, based on the applicant's qualifications and interest. Officers who are recommended are placed in a pool of eligible applicants and remain eligible for two years. They also undergo further evaluation by the Tac Squad in accordance with procedures approved by the Chief of Police.

The proposed consent order also fashions immediate relief for black officers with service dates of January 1, 1980, or earlier. If these officers submit timely applications, they will be screened for recommendations by their commanding officers. Among those who receive recommendations, two will be assigned to fill the next two vacancies on the Tac Squad. At least two more black officers will be assigned to the Tac Squad in each of the next two years.

The Court approves this form of relief. Once again, the history of exclusion of black officers from the Tac Squad and the absence of objective criteria for selecting assignees persuades me that the plaintiffs could well prove discrimination in this context, and immediate corrective action and the promulgation of a uniform procedure for future assignments are appropriate responses to the problem.

■ The Police Department is divided into seven geographic districts. The south side of Milwaukee, which is more predominantly white than other regions of the city, is divided into Districts Two and Six. Black officers have never been assigned to these two districts. Intentional segregation is acknowledged in this context, although the argument is made that black officers relate better to the problems and needs of the black community and should, therefore, be assigned to those areas.

The Court is persuaded that the plaintiffs could prove intentional discrimination and is not impressed by the proffered justification for this practice. The rationale is based on a racial stereotype that blacks work better with blacks, and on a premise that the race of these officers is directly related to their ability to do the job. Title VII does not permit discriminatory employment practices to rest on these grounds. *Knight v. Nassau County Civil Service Commission*, 649 F.2d 157, 162 (2d Cir.), *cert. denied*, 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 87 (1981).

The proposed consent order provides that two volunteering black officers will be immediately transferred to each of Districts Two and Six. An additional four black officers are to be assigned to each of these districts within one year.

This form of relief is approved. There is little question that the segregation was intentional and was based on considerations that the law does not permit. While one could say that this portion of the consent order establishes racial quotas for Districts Two and Six, any argument of reverse discrimination would necessarily fail, because there has been no showing. that assign-

ments to the various districts are made on the basis of seniority, merit, and so forth.

■ The fifth subject of the proposed consent order is the establishment of standardized assignment procedures. The Police Department has never articulated any criteria for determining eligibility for assignments to specialized bureaus or specialized assignments within districts, nor has it ever provided formal notice of vacancies within the specialized bureaus or in the miscellaneous exempt positions. The Chief of Police has stated that the only criterion for assignment to a bureau or a miscellaneous exempt position is his belief that the officer is "the best qualified for the position."

The proposed consent order establishes a procedure for applications to certain of the specialized bureaus. Generally, the Chief of Police is required to state all criteria that are considered in selecting officers for particular assignments. Consideration of any other criterion is forbidden thereafter. Additionally, the Police Department is required to post notices of vacancies in special bureaus at the bureaus and the district stations.

The proposed consent order also requires the Chief of Police to review the criteria for assignments within special districts, and to indicate which criteria are to be considered by the district commanders when making their assignments. These assignments are to be reviewed by the district commanders once every three months, and no assignment can be continued beyond three months in the absence of special circumstances.

The Court approves these procedures. Standardless, subjective selection procedures often facilitate covert discrimination. *See Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir.1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977). Assuming the plaintiffs prevailed on their claims of discrimination, this Court would be empowered to order the defendants to develop objective standards for assignments and to provide for notice to all interested persons. Given the plaintiffs'

showing with respect to their claims of discrimination in promotion and assignment, the Court approves the procedures set forth in paragraphs 39 through 41 of the proposed consent order.

In addition to provisions for recordkeeping and several other miscellaneous matters, the proposed consent order provides for a compensatory relief fund. While neither compensatory nor punitive damages are available in actions under 42 U.S.C. § 2000e–5, *see Albemarle Paper Co. v. Moody*, 422 U.S. at 419, 95 S.Ct. at 2372, the plaintiffs have predicated their claims in part on 42 U.S.C. §§ 1981 and 1983. Compensatory and punitive damages are available under both of these latter statutes in appropriate cases. Thus, in addition to the back pay relief afforded elsewhere in the order, the plaintiffs bargained for damages to the class based on what they perceived to be purposeful discrimination.

The plaintiffs negotiated for a compensatory relief pool of $99,000. Of this amount, $29,000 is earmarked for resolution of individual claims of discrimination that were the subject of this Court's order of May 14, 1982, and for resolution of an outstanding charge filed with the Equal Employment Opportunity Commission by Earl Marshall. The remaining $70,000 is to be distributed among the named plaintiffs and the members of the class, with $12,000 going to the named plaintiffs. The amount that will ultimately go to each class member will not be very large, yet this form of relief is rather unusual, because monetary relief in cases of this nature is usually limited to back pay.

The Court finds that the distribution of $58,000 among the class members as compensatory relief is a fair compromise in this case. While the plaintiffs have shown a strong likelihood of succeeding at trial on a claim of disparate impact, the matters presently before the Court do not lend such strong support to their claims of intentional discrimination, except with respect to the segregation of Districts Two and Six. This is not to say that plaintiffs would be unable

to prove discriminatory intent; it is only a recognition that problems of proof attend a required showing of intent. While the amounts the class members will recover are indeed small, all the class members are benefitted by the proposed consent order's prohibition against discriminatory practices in promotions, transfers, and assignments, and this was clearly the primary objective of the lawsuit. The provision for monetary relief in the form of a compensatory relief fund will be approved.

In sum, the Court is satisfied that the plaintiffs have demonstrated a strong chance of prevailing on at least some of their claims if this matter were to proceed to trial. The relief afforded in the proposed settlement responds to the plaintiffs' claims in a manner that is fair and reasonable in the unique context of this case. Therefore, my consideration of the merits of the plaintiffs' claims and the terms of the settlement leads me initially to conclude that the proposed consent order should be approved.

### 2. *Opinion of Counsel on the Fairness of the Settlement*

All the attorneys who negotiated the proposed consent order favor its approval, except for counsel for the United States, whose position is indeterminate. The Court is impressed by the skill and experience of these attorneys, and does not question their ability adequately to present their clients' interests.

### 3. *Stage of the Proceedings and the Amount of Discovery Completed*

This action was tentatively settled on the eve of trial, after a massive discovery effort. There is no question that all parties and the Court are presently able to render an informed judgment on the merits of the plaintiffs' claims. Thus, there is no risk that the defendants have been pressured to settle a frivolous action.

### 4. *The Possibility of Collusion Among the Parties in Reaching the Settlement Agreement*

There is no indication that this settlement was tainted by improper collusion. The parties all indicated an interest in settling this matter, yet the negotiations broke down on at least two occasions when the parties' positions appeared inflexible. Additionally, the presence of the Special Master during the negotiations eliminated any possibility of abuse.

### 5. *The Length, Complexity, and Cost of Further Litigation*

Cases of this variety require vast amounts of time for preparation. For example, Civil Action No. 81–C–1465 has been on this court's civil docket for over two years, and while that is not an extraordinary length of time, the matter should certainly be tried promptly in fairness to the parties, if it is to be tried at all. However, if the proposed consent order is rejected, the parties will require additional time to notify their witnesses and prepare for a final pretrial conference. Trial of the liability phase of this lawsuit would certainly take several weeks, and if the plaintiffs prevailed, an additional week or two would be devoted to arguments on remedy. That would not end the matter, for the losing party would probably appeal. In sum, this matter could remain in the courts well into 1987. Immediate relief is preferable to another several years of litigation, which could well bring unforeseen results depending on the composition of the Supreme Court in future years.

Additionally, counsel for the plaintiffs have devoted substantial financial resources to this case. They have retained two expert witnesses who will have to be compensated. They have devoted an enormous amount of their time to discovery and negotiation efforts, presumably sacrificing other opportunities. While I do not suggest that the City's resources are infinite, it clearly has the upper hand in a battle of economic attrition. In this regard, settlement is in the interest of the certified class.

### 6. *The Defendants' Ability to Pay*

The defendants have agreed to pay the amounts discussed earlier in this order, and

have made no suggestion of hardship. This factor is not at issue.

### 7. *Reactions of the Class Members to the Settlement Agreement*

The remaining factor to be considered is whether the class members' objections to the proposed consent order are so substantial as to demand that I reject the proposal and set the matter down for trial. I have reviewed the objectors' submissions, and considered the testimony of those who spoke at the fairness hearing. While I acknowledge that many of the objections are well grounded, I conclude that approval of the proposed consent order is in the class's interest.

 At the outset, I observe that while the presence of objecting class members is a relevant factor, it is not dispositive even when many class members object. *Armstrong v. Board of School Directors*, 616 F.2d 305, 326 (7th Cir.1980). Thus, other courts have approved settlements over the objections of large numbers of class members. *See, e.g., Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir.1983) (settlement approved over objections of more than six hundred of 1,469 class members and twenty-three of twenty-seven named plaintiffs).

Nonetheless, the presence of so many purported objections in this case is cause for concern. Prior to the fairness hearing, the Court received thirty-one submissions opposing the consent order, and fifteen of these were from class members. One of them, a "Memorandum of Exceptions," was prepared by three of the named plaintiffs and was accompanied by the signatures of one hundred six class members.[5] Of these one hundred six signators, thirteen filed individual objections. Thus, the Court estimates that approximately one hundred eight class members oppose part or all of the proposed consent order. The class is comprised of approximately two hundred

persons. While the facts surrounding the gathering of the one hundred six signatures were the subject of dispute at the fairness hearing, the Court made a finding at the close of the hearing that more than fifty percent of the class opposed part or all of the proposed consent order.

Counsel for the certified class now argue that there are really only twenty-three objectors to the proposed consent order. They cite the concessions of two of the objectors at the fairness hearing that some of the signators never read the "Memorandum of Exceptions," and that others only partially agreed with the memorandum's objections. They also refer to a letter prepared by Lenard Wells, which was received at the fairness hearing and marked as Exhibit One. This letter tells all signators that as a subscriber to the "Memorandum of Exceptions," it was "imperative" that they appear at the fairness hearing. Because only seventeen signators actually appeared at the hearing, because two others indicated their concurrence in the "Memorandum of Exceptions" through counsel, and because, by their calculations, there were only four other class members who filed written objections, there are really only twenty-three objectors.

The Court adheres to its conclusion that the number of objecting class members is approximately one hundred eight. Counsel's argument gives too much weight to the letter by Wells directing the signators to appear. The signators could well have assumed that Messrs. Wells, Durrah, and Horton, who prepared the "Memorandum of Exceptions," and those who circulated it, would adequately represent their interests. The fairness hearing conflicted with some people's work schedules, and a decision on the part of a signator to let the others speak on his behalf is understandable under the circumstances. The objectors' testimony supports the conclusion that those who subscribed to the "Memorandum of

---

5. The attorneys for the certified class state that there are one hundred nine signatures appended to this submission. The discrepancy is explained in part by the facts that one of the

objecting named plaintiffs signed his name with the signators as well as on the main document, and that the signature of one of the objectors appears twice.

Exceptions" were at least generally aware of the proposed consent order's components and had an objection to one or more of them.

Unfortunately, it is impossible to determine how many class members objected to a particular provision in the proposed consent order. The Court finds that a number of the signators did not read the "Memorandum of Exceptions" or the proposed consent order, and that others indicated concurrence only in certain parts of the "Memorandum of Exceptions." Therefore, while I conclude that a majority of the class members have one or more objections to the proposed consent order, the percentage of the class that concurs in a specific objection cannot be determined.

I turn, then, to the principal objections. First, many of the persons filing written objections and appearing at the fairness hearing disapproved of the process by which settlement was reached. They argued that the class was not adequately apprised of the negotiation proceedings, and should have been given an opportunity for input. Additionally, they argued that the proposed consent order should have been brought to the class for a vote of ratification.

The Court finds that counsel for the class was not required to, and could not in fact, remain in constant communication with the class. A measure of confidentiality in negotiations is a necessary attribute of a successful settlement effort. To impose a requirement that meetings of the class be held on a weekly basis for the purposes of discussing the posture of negotiations and gathering commentary from dissenting class members would have delayed the negotiations, but more importantly, dissemination of the parties' respective positions in negotiation proceedings puts a strain on the parties' ability to reach an accord. The negotiations were the subject of widespread publicity in the Milwaukee area printed and electronic media. Rumors about tentative resolutions can distort the realities of the parties' agreement, and the resultant pressure that is brought to bear on the attorneys can stymie the settlement efforts.

■ In the present case, the efforts of certified class counsel and the negotiating team to inform the class were more than adequate. Counsel were present at the meeting on November 26, 1983, when the negotiating team was approved, and the class members in attendance were advised at that time of the goals the negotiators hoped to reach. At another meeting on December 17, 1983, counsel gave a presentation of the proposed consent order and distributed a summary sheet to the class members in attendance. At the meeting on February 11, 1984, counsel and the negotiating team described the negotiating process and the provisions of the proposed consent order. On March 6, 1984, counsel mailed a seventeen page letter to every class member, answering numerous questions and summarizing the proposed consent order. Finally, throughout the course of litigation, counsel conferred with small groups of class members or individual class members. These contacts were sufficient.

While there was not a vote on whether to ratify the proposed consent order, the Court does not understand how such a vote could have been beneficial, because few members of the class ever attended League of Martin meetings (always significantly less than a majority), and because less than one-third of the class responded to a questionnaire mailed by certified class counsel. Until the weeks immediately before the fairness hearing, interest in the settlement among class members appears to have been low, and thus a ratification vote would not necessarily have represented the attitude of the class as a whole.

■ Fed.R.Civ.P. 23 does not require a settlement ratification vote. As stated earlier, there will almost inevitably be dissent within a class of litigants, and certified counsel is thus afforded discretion to act in what he perceives to be the best interests of the class. In this case, counsel and an approved negotiating team worked together to protect the class's interests. I find that this procedure was sufficient.

Another objection was made to the absence of relief with respect to command exempt positions. These positions consist of thirty-six positions above the rank of lieutenant. Promotions to these positions are made by the Chief of Police pursuant to his authority under Wis.Stat. § 62.50(7). Persons promoted to these positions are required first to serve as lieutenants. There are no uniform objective criteria for promotions; the Chief of Police bases his decision on whether he perceives a particular individual to be the best person suited for the job. All of these positions are presently held by white persons. In the past, only one black person, Dewey Russ, has ever held a command exempt position.

While the plaintiffs would appear to have been able to make a prima facie showing of discrimination in this context, the defendants were prepared to rebut this showing by arguing that there are no black officers qualified for promotion to a command exempt position, and that the requirement of prior service as a lieutenant is job related. The negotiating team and counsel were aware of the legal obstacles to obtaining a remedy, and the absence of any relief in this context reflects a compromise in the negotiations. While the court does not approve wholesale exclusion of black officers from these positions, counsel's and the negotiating team's decision to compromise in this regard and to press other claims was fair.

Other objections were based on a perception of favoritism towards plaintiff Arthur Jones and other officers. However, for the most part, the provisions for individual relief in the proposed consent order do not name specific candidates for relief. The plaintiffs argued at the negotiating table that appointments made from eligibility lists should be by lottery. The provisions for rank-ordered selection were promulgated at the defendants' insistence. Under the circumstances, the Court regards this as a fair compromise.

Many of the objections centered on the provision for promotions to lieutenant of detectives. In this regard, the defendants insisted that the prospective promotions be made with reference to their examinations despite the plaintiffs' contention that these examinations were discriminatory. Thus, the persons with arguable claims to promotion were Arthur Jones, Darryl Rogers, and Johnnie Smith. Both Rogers and Smith were on the 1980 eligibility list. Jones's claim was based on his contention that he would have been on the eligibility list had he not been barred from competing.

The provision that Jones would be given priority over Smith was promulgated as a resolution of an Equal Employment Opportunity Commission ("EEOC") charge, in which the EEOC found reasonable cause to believe that the defendants had discriminated against Jones with respect to a special assignment. At negotiations, the defendants apparently conceded that Jones had a fair chance of prevailing on this claim, and the provision for his promotion to lieutenant of detectives reflects a compromise on this point.

Allocation of relief among class members is a difficult task. Yet it is not uncommon for class members with prior charges of discrimination to receive special relief in settlement. In addition, the Court is aware that Jones filed the EEOC charge upon which this lawsuit is based and has been instrumental in prosecuting this lawsuit since the date it was filed. While the provision in dispute is somewhat unfair to Mr. Smith given the defendants' insistence on using their allegedly discriminatory examinations as criteria, I find that a provision for individual relief for Jones is appropriate, and the form of relief proposed is fair.

The objectors also expressed dissatisfaction with the five-year duration of the proposed consent order. Yet the order provides for an extension in length should any concern about discrimination continue. I do not read the proposed consent order as locking the class into a promotion and transfer procedural scheme that may someday prove inadequate.

One final objection deserves comment. It is no secret that many of the class mem-

bers are offended by the provision of the proposed consent order which states that the relief afforded shall not constitute an admission by the defendants that they have engaged in unlawful discrimination. Those objecting to this portion of the order would apparently prefer that this case go to trial so that a formal finding of discrimination could be entered on the record.

In some circumstances, the process of litigating in a full-blown trial claims such as those alleged here has a beneficial effect beyond that brought about by the specific results obtained in the judgment. I do not think that those circumstances prevail here. As stated earlier, taking this case to trial and prosecuting the appeals would be expensive and time consuming, and many years would pass before a judgment for the plaintiffs could be put into effect, assuming that the plaintiffs would ultimately prevail at some future time before the Supreme Court as then comprised.

The proposed consent order will be approved and adopted as the order of the Court. At the fairness hearing, the parties agreed that the United States should be severed from 81–C–1465, and therefore the references to the United States have been excised from the proposed consent order. It should also be noted that at the fairness hearing, a true copy of the proposed consent order filed January 25, 1984, was offered and marked as Exhibit II. This copy of the proposed consent order bears the signatures of counsel for the parties in 81–C–1465 and 74–C–480, although the Assistant U.S. Attorney and Civil Rights Division Attorney in 74–C–480 indicated that they approved this form of consent order only in 81–C–1465.

Contemporaneous with this decision, the Court is also approving the consent order between the United States and the defendants in 74–C–480. The order in that case is almost identical to the order approved here. Many differences are the consequence of stylistic preference, such as the insertion or deletion of commas, and do not alter the substance of the proposals. Other differences reflect an effort to ensure clarity, such as the insertion of the phrase "of the expiration of the dispute resolution period" between the words "fifteen (15) days" and "file with the Court" in paragraph 11 of the order proposed in 74–C–480, which corresponds to paragraph 11 of the order proposed in 81–C–1465.

The reasons for other discrepancies are not so obvious. In particular, paragraph 36 of the proposed order in 81–C–1465 and paragraph 33 of the order proposed in 74–C–480, which establish procedures for assignment to the Tac Squad in the context of individual relief, impose somewhat different obligations on the defendants. The order proposed in 74–C–480 provides that of the black officers recommended for Tac Squad assignment, "at least four" of the most qualified shall be assigned to Tac Squad vacancies "consistent with the needs of the MPD but in no event later than two years after entry of this Order." By contrast, the corresponding paragraph in the proposed order in 81–C–1465 provides that of the black officers recommended for Tac Squad assignment, "[t]here shall be a minimum of two (2) additional assignments of qualified black officers to the [Tac Squad] in each of the next two (2) years." Thus, the City could assign four black officers to the Tac Squad within a single year, and this would be consistent with the proposed consent order in 74–C–480, provided that the four officers in question were among the most qualified of those recommended, and provided that the assignments were made within two years of the entry of the order. Yet this would violate the order proposed in 81–C–1465, because that order contemplates two assignments per year for each of the next two years. Conversely, the order in 74–C–480 permits an assignment procedure that is wholly consistent with the procedure proposed in 81–C–1465. The point is therefore minor. It merits mention, however, because there is a possibility that the parties in both cases may have to work together to resolve problems of interpretation. The Court has no doubts that the parties are prepared to resolve any such difficulties through amicable, good-faith negotiation pursuant to paragraph 48

of the order in 81–C–1465 and paragraph 43 of the order in 74–C–480.

Another difference between the two proposed orders pertains to issues of finance and compensation. Specifically, the order proposed in 81–C–1465 contains a provision that the City set aside a sum of money for monitoring selection procedures, while no corresponding provision appears in the proposed order in 74–C–480. Additionally, the proposed order in 81–C–1465 creates monetary relief pools for the positions of sergeant, detective, and lieutenant of detectives in paragraphs 25, 26, and 30, respectively, and a compensatory relief fund in paragraph 46. There are no corresponding provisions in the order proposed in 74–C–480. However, paragraph 45 of the order proposed in 74–C–480 adopts the monetary relief pools by reference, and therefore there is no possibility that the defendants will be exposed to competing obligations. Nor is it likely that the United States will challenge the establishment of an annual fund for monitoring selection procedures.

The remaining differences between the two orders are (1) the establishment of a procedure for promotion to exempt positions in paragraphs 31–33 of the order proposed in 81–C–1465, which does not appear in 74–C–480, and (2) a provision in paragraph 47 of the order proposed in 81–C–1465 to the effect that the proposal does not purport to resolve claims of retaliation by certain named individuals, which does not appear in the order proposed in 74–C–480. Once again, the chances of a government challenge to either provision are non-existent.

### ORDER

IT IS THEREFORE ORDERED that Civil Action Nos. 74–C–480 and 81–C–1465 are hereby severed.

IT IS FURTHER ORDERED that certified class counsel's motions to withdraw as counsel for Lenard Wells, Ronnie Horton, and Bobbie Durrah are granted *nunc pro tunc* April 5, 1984.

IT IS FURTHER ORDERED that the certified class's motion to substitute the identity of Dorothy Downing for Jane Doe is granted.

IT IS FURTHER ORDERED that the certified class's motion to make discovery documents available to the court is granted, except that matters subject to protective orders shall remain confidential.

IT IS FURTHER ORDERED that the proposed consent order is approved and adopted as the order of the court in Civil Action No. 81–C–1465, the consent order being attached hereto.

### CONSENT ORDER

League of Martin, and the certified class, and the defendants City of Milwaukee, et al, hereby agree to the entry of the following Consent Order in resolution of all issues, with the exceptions provided for herein, of the League of Martin's complaint filed November 19, 1981, as amended and supplemented, asserting discriminatory practices within the Milwaukee Police Department ("MPD") in the assignment, transfer, and promotion of its sworn employees.

The parties, desiring to settle all issues raised by the complaint except as otherwise provided for herein and motions for supplemental relief by appropriate order, agree to the jurisdiction of this court over the subject matter of these claims, and hereby waive, for purpose of the entry of this order, a trial and the entry of findings of fact and conclusions of law. This order, being entered with the consent of the defendants, shall not constitute an admission, adjudication, or finding of discrimination, and the defendants expressly deny that any unlawful discrimination has occurred in the assignment, transfer, or promotion of sworn employees of the MPD. The City and its officials, sharing the objective of ensuring equal employment opportunity within the MPD, and desiring to avoid protracted and unnecessary litigation, accept this order as final and binding among the parties signatory hereto and as to the matters resolved herein, subject to such modification as may be ordered by the Court.

IT IS THEREFORE ORDERED:
## GENERAL PROVISIONS

1. The defendants, by and through their authorized officials, agents, and employees acting within the scope of their employment, shall not engage in any act or practice which has the purpose or effect of unlawfully discriminating because of race against police officers in assignment, transfer, and promotion within the MPD.

2. Further, the defendants shall not retaliate against any person in any manner because of that person's participation in or cooperation with this investigation, litigation, or the administration of this Order. Remedial actions and practices required by the terms of this Order are in response to claims made and are consistent with the meaning of 42 U.S.C. sec. 2000e, *et seq.,* as amended.

3. The plaintiffs and the defendants agree to defend the terms and conditions set forth in this Order against any challenge that the provisions thereof are unlawful. If any collateral lawsuit arises in connection with this Consent Order in state court, the defendants will remove, to the extent permitted by law, such action to the United States District Court for the Eastern District of Wisconsin. As soon as practicable, but in any event no later than ten (10) days after the defendants are notified of any challenge or a lawsuit, the defendants shall notify the plaintiffs' counsel of the pendency of the lawsuit.

4. It is the purpose of this Order to ensure that blacks are considered for assignment, transfer, and promotion on an equal basis with whites; that blacks are not disadvantaged by unlawful employment policies and practices; and that past disadvantages, if any, suffered by particular black officers are remedied as provided herein. Consistent with paragraph 5 below, the defendants shall assign and promote qualified officers within the MPD in a nondiscriminatory manner.

5. The parties fully understand and agree that the adoption and implementation of the provisions of this Order concerning promotion do not obligate the defendants to assign or promote any officer who is not qualified by valid qualification standards pursuant to the *Uniform Guidelines on Employee Selection Procedures,* 28 C.F.R. § 50.14, 29 C.F.R. § 1607, and 31 C.F.R. § 51.53 ("Uniform Guidelines"), or to grant a preference in assignments or promotions to any person except for those persons afforded specific relief for past practices as set forth herein.

## NONEXEMPT PROMOTIONS: PROCEDURES

6. The Fire and Police Commission ("FPC") shall refrain from using its current selection procedures for police sergeant and detective. The FPC shall modify current components of its selection procedures or develop new components for police sergeant and detective in conformance with the Uniform Guidelines. In order to ensure these new selection procedures conform to the Uniform Guidelines, the defendants agree to retain a mutually agreed upon, impartial, and professionally qualified outside testing expert, nominated by the FPC and approved by the plaintiffs who shall consult with the FPC in the design, development, and administration of the new selection procedures for police sergeant and detective.

The plaintiffs shall have the opportunity to meet with and question candidates for the position of Testing Expert as to each candidate's prior work experience and her or his proposed methodology regarding the consultation work desired herein, and her or his understanding and application of the *Uniform Guidelines.*

7. The expert may be dismissed by the FPC at any time upon notice to the plaintiffs. Upon any such dismissal, the defendants shall retain as a replacement a mutually-agreed upon, impartial, and professionally qualified outside testing expert nominated by the FPC and approved by the plaintiffs.

8. The Testing Expert shall seek direction from, cooperate with, and seek advice and assistance from the FPC with the

view toward the design of selection procedures consistent with the requirements and standards of the *Uniform Guidelines.* The expert's mission shall be to develop, in conjunction with the FPC, modified or newly-developed selection procedures which, consistent with the *Uniform Guidelines,* validly predict successful job performance and which eliminate or minimize adverse impact.

9. The expert shall submit three (3) aspects of a selection procedure, namely, the job analysis, test development and test administration, to the FPC for its approval. Upon approval of the FPC of any such aspect, the FPC shall notify and simultaneously make available to plaintiffs' counsel under appropriate protective orders the results of that aspect together with all information available indicating the manner in which the expert prepared the procedure.

10. For the police sergeant and detective positions, the modification of current selection procedure components or development of new components shall be based upon new job analyses conducted in accordance with the *Uniform Guidelines,* which shall include direct observation of job task performance, employee interviews, and recommendations as to years of service requirements.

11. Should plaintiffs dispute the conformance of any job analysis to the *Uniform Guidelines,* plaintiffs shall submit written notice specifying areas of dispute to the City Attorney within twenty (20) days of the receipt of notice of FPC approval of the job analysis. All parties shall then have twenty (20) days, unless extended by agreement of all parties, to meet and resolve the dispute. If the dispute is not resolved, the plaintiffs shall within fifteen (15) days file with the court a notice with specifications as to objections and the unsuccessful negotiations, requesting the dispute be resolved by the Special Master. In any such hearings before the Special Master, plaintiffs shall have the burden of going forward to establish that the chal-

lenged job analysis does not conform to the *Uniform Guidelines.*

12. With the exception of objections raised due to changed circumstances, plaintiffs agree not to challenge the job analysis after the expiration of any time period set forth in the above paragraph or after resolution by the Special Master of any dispute as set forth in paragraph 11. If a job analysis is not the decision of the Special Master, the job analysis shall not be challenged by plaintiffs as to conformance with the *Uniform Guidelines* in subsequent examinations wherein the City has not altered the applicable job position.

13. As to the test development aspect, should plaintiffs dispute any test item as to readability under professionally-recognized standards, or the conformance of written test or assessment center items, or the intended use of other examination components to the job analysis under professionally-recognized standards and the *Uniform Guidelines,* plaintiffs shall submit written notice specifying areas of dispute to the City Attorney within twenty (20) days of the receipt of notice of FPC approval of test development. All parties shall then have twenty (20) days, unless extended by agreement of all parties, to meet and resolve the dispute. If the dispute is not resolved, the plaintiffs shall within fifteen (15) days file with the court a notice, with specifications as to objections on these grounds and the unsuccessful negotiations, requesting the dispute be resolved by the Special Master. In any such hearing before the Special Master, plaintiffs shall have the burden of going forward to establish that the challenged test development does not conform to standards of the *Uniform Guidelines.*

14. With the exception of objections raised due to changed circumstances, plaintiffs agree not to challenge the test development as to readability or conformance of written test or assessment center items, or the intended use of other examination components to the job analysis after the expiration of any time period set forth in paragraph 13 above or after resolution by the

Special Master of any dispute as set forth in paragraph 13. If the test development is not challenged as to readability or conformance of written test or assessment center items, or as to the intended use of other examination components to the job analysis, or if such a challenge is resolved by a decision of the Special Master, plaintiffs agree not to challenge those items or components in subsequent examinations in which the applicable job position has not been altered.

15. For the new police sergeant and detective procedures, the FPC shall estimate the number of vacancies to be filled from the resulting eligibility lists. In the event it appears from the FPC projections that the administration of the new selection procedures for either police sergeant and detective will result in adverse impact on black applicants, the expert shall, consistent with the requirements of paragraph 8 above, make recommendations to the FPC as to minimizing or eliminating adverse impact by implementing changes which may include but are not limited to: changes in previously-noticed component weights, the elimination of individual written test questions, a change in the pass/fail point of the written test, a change in the written test from a ranking device to a pass/fail use, the extension or reduction of the eligibility list lifetime to ensure a certain number of appointments, or the use of a banding or grouping methodology rather than ranking in strict numerical order or other recognized psychometric techniques.

16. In the event that a police sergeant or detective examination procedure does not from the FPC projections result in adverse impact through the use of changes listed in paragraph 15 or other acceptable changes, plaintiffs agree they will not, on behalf of the black class, challenge the administration of the new selection procedures in the absence of intentional discrimination.

17. In the event it appears from the FPC's projections that the examination procedure will result in adverse impact and 1) the FPC fully conforms to the expert's recommendations as to the use of the procedure to minimize or eliminate adverse impact, and 2) the expert, using professionally accepted techniques, conforms to the *Uniform Guidelines'* requirements with respect to producing evidence of validity and seeking alternative procedures which retain validity and minimize or eliminate adverse impact (see *Uniform Guidelines*, Section 3B), plaintiffs agree they will not, on behalf of the black class, challenge the administration of the modified or newly-developed selection procedure. In no event shall plaintiffs at this time challenge the job analysis or test development aspects of the selection procedure.

18. Plaintiffs agree that notwithstanding the provisions of paragraph 25 of this order pertaining to the use of existing selection procedures, no challenge will be made to any future selection procedure developed by the FPC on the ground that an addition of a constant which reflects the difference in group mean scores in any component of a higher scoring group to the scores of a lower scoring group so as to eliminate adverse impact, was not used.

19. In the event that the FPC does not fully conform to the expert's recommendations as to minimizing or eliminating adverse impact or the expert does not produce validity evidence which conforms to the *Uniform Guidelines* as to minimizing or eliminating adverse impact, the above provisions for the twenty (20) day dispute notice, twenty (20) day dispute resolution, and fifteen (15) day court filing shall apply. Plaintiffs may only challenge the test administration on these grounds within these time limits. Any party may file timely objections to the decision of the Special Master with the United States District Court pursuant to Rule 53, F.R.Civ.P. In the event that the FPC fully conforms to the expert's recommendation as to minimizing or eliminating adverse impact but plaintiffs challenge before the Special Master the conformance of the expert's recommendations to the *Uniform Guidelines*, plaintiffs must establish that the expert's consideration of alternatives was not reason-

able as defined by Section 3B of the *Uniform Guidelines.*

20. After the next lieutenant of detectives eligibility list has been compiled but prior to its being published, the FPC shall make available to plaintiffs the list, the projected number of selections to be made from it, and the composite scores and individual component scores of each applicant by race, sex, and national origin. Within twenty days (20) of receiving that information from the FPC, plaintiffs shall make a preliminary determination as to the adverse impact in the selection of applicants from the list. If on this basis plaintiffs file written objection with the court, the defendants will not make any appointments from its proposed eligibility list until such time as the parties or the Special Master, in dispute resolution proceedings under the time limits set forth in paragraphs 11, 13, and 19, determine that the FPC has complied with the *Uniform Guidelines.* Except insofar as the FPC has incorrectly projected the number of appointments, plaintiffs agree not to challenge this examination on behalf of the black class after the expiration of the above time limits. Should the actual number of appointments result in adverse impact, plaintiffs are not bound by these time limits.

21. During any challenge to the job analysis, test development, test administration, or eligibility list, there shall be no implementation of this aspect of the selection procedure until the dispute is resolved.

22. The City agrees to set aside Ten Thousand ($10,000) Dollars annually for the plaintiff class during the life of this Order for purposes of monitoring selection procedure aspects. This shall not include any attorneys' fees and disbursements in connection with any challenge for the Special Master or enforcement proceedings.

Attorneys for the plaintiff class shall present an itemized statement to the City Attorney by November 30 of each year for selection procedure monitoring work done during the preceding twelve (12) months.

Except as provided above, plaintiffs and their counsel shall bear the costs of monitoring of selection procedure aspects of this Order.

## NONEXEMPT PROMOTIONS: INDIVIDUAL RELIEF

23. The parties recognize that numerous black officers took the police sergeant and detective examinations and were not promoted. Without being able to determine which of those officers would have been promoted, the parties agree to the following relief.

*Sergeant*

24. The parties agree that Police Officer Verbie Swanigan, who filed EEOC Charge # 055771635 and who took and passed the examination for police sergeant in 1981, shall be appointed to the next police sergeant vacancy prior to the establishment of the next police sergeant eligibility list. Officer Swanigan shall receive backpay and seniority as a sergeant retroactive to November 7, 1982. Backpay shall equal the difference between the maximum pay of a police officer and the starting pay for a police sergeant. Upon accepting this relief, Officer Swanigan must sign a release of any and all claims against the defendants based upon race discrimination.

25. The parties recognize that certain black officers took and failed the 1977 and 1981 written test for police sergeant and thus did not compete in the other components of the selection procedures. Those officers shall constitute a police sergeant consent order pool.

(a) Subject to the availability of qualified black officers in the police sergeant Consent Order pool, the first two (2) appointments shall be made in the following manner: No black officer shall be considered under this subparagraph who would not, without the addition of a constant which reflects the difference in the mean scores on the 1981 police sergeant written test of white police officers and black police officers, have passed the 1981 test. Those black officers who wish to be considered under this subparagraph and are still available for appointments to police sergeant

shall take a special assessment center exercise administered by the FPC. From among those black officers who successfully complete the special assessment center exercise, the FPC shall select up to two (2) officers who shall be appointed to the next police sergeant vacancies prior to the establishment of any future police sergeant eligibility list.

(b) In order to make a third appointment from the remaining officers in the police sergeant consent order pool, the FPC shall administer the new nondiscriminatory selection procedure for police sergeant. The black officer from this pool whose composite score is highest among those qualifying by the new procedure and who is available shall receive a priority appointment to police sergeant. After that appointment, the eligibility list resulting from the nondiscriminatory procedure shall be followed.

(c) In the event the procedure under subparagraph (a) does not result in two (2) black police officers available for promotion to sergeant, then the additional sergeant appointment(s) shall be made pursuant to subparagraph (b).

The three (3) officers appointed pursuant to this paragraph shall receive seniority as a sergeant, retroactive to November 7, 1982. All black officers who took the written examination component of the 1977 or 1981 police sergeant examination and have not been appointed police sergeant or detective and who will not be appointed police sergeant or detective under this decree shall receive an equal pro rata share of the Sergeant Monetary Relief Pool provided herein. The Sergeant Monetary Relief Pool shall be determined by calculating the difference between the maximum pay for a police officer and the starting salary for a police sergeant during the period from November 7, 1982, to the dates of appointment for each of the three (3) appointments under this paragraph. Officers provided relief under this paragraph must sign a release of any and all claims against the defendants based upon race discrimination.

*Detective*

26. The defendants shall appoint five (5) black police officers from the 1981 detective eligibility list prior to the establishment of the next detective eligibility list. The five (5) officers to be appointed are those ranking highest on the 1981 eligibility list who are available for appointment when the vacancies occur.

All black police officers who took the written examination component of the 1977 or the 1981 detective examination who were not promoted to the position of either sergeant or detective and who will not be promoted to either of such positions under the terms of this order shall receive an equal pro rata share of the Detective Monetary Relief Pool provided herein. The Detective Monetary Relief Pool shall be determined by calculating the difference in pay between a police officer with five (5) or more years of service and the starting salary for the position of police detective for the period from January 1, 1983, to the date of appointment for each of the five (5) appointments above. The five (5) officers appointed pursuant to this paragraph shall receive seniority as a detective retroactive to January 1, 1983. The five (5) black police officers provided relief under this paragraph must sign a release of any all claims against the defendants based upon race discrimination.

*Lieutenant of Police*

27. The FPC shall extend the current lieutenant of police eligibility list, if necessary, to ensure appointment through # 8 on that list.

*Lieutenant of Detectives*

28. The parties agree that Darrel Rodgers, highest ranking black detective who was not promoted on the 1980 Lieutenant of Detectives eligible list, shall be appointed to the next Lieutenant of Detectives vacancy prior to the establishment of a new eligible list.

29. The parties recognize that Arthur Jones on February 17, 1976, filed EEOC Charge # TMK6–1169 as amended on May 19, 1976, alleging discrimination in assign-

ment and promotion, and the parties further recognize that after investigation, the EEOC found and determined there was reasonable cause to believe discrimination had occurred. The defendants, without admitting discrimination but desiring to resolve those outstanding charges, agree Arthur Jones shall, provided he passes all components of the next Lieutenant of Detectives examination, be appointed to the next Lieutenant of Detectives vacancy. Upon appointment as Lieutenant of Detectives, Arthur Jones shall receive backpay and seniority as a Lieutenant of Detectives, retroactive to August 17, 1982. Backpay shall be calculated based upon the difference between the maximum pay for a detective and the starting pay for a Lieutenant of Detectives.

In addition, Johnnie L. Smith, the remaining black detective on the 1980 eligibility list, shall receive the total backpay award from the Lieutenant of Detectives Monetary Relief Pool, subject to the following exceptions.

In the event that Arthur Jones does not pass a component of the next Lieutenant of Detectives examination, thereby not qualifying for promotion, Johnnie L. Smith, if available for promotion, shall be promoted to the next Lieutenant of Detectives vacancy. If Johnnie L. Smith receives the promotion to Lieutenant of Detectives under the circumstances described above, the total award from the Lieutenant of Detectives Monetary Relief Pool shall be paid into the Compensatory Relief Pool.

30. The Lieutenant of Detectives Monetary Relief Pool shall be determined by calculating the difference between the maximum pay for a detective and the starting salary for a Lieutenant of Detectives during the period from August 17, 1981, to the date of appointment of Darrel Rodgers to Lieutenant of Detectives.

The three (3) detectives provided relief under this paragraph must sign a release of any and all claims against the defendants, based upon race discrimination.

## EXEMPT PROMOTIONS: PROCEDURES AND INDIVIDUAL RELIEF

31. The parties agree that black officers shall hereafter be appointed to vacancies in those positions below which remain exempt. The FPC agrees to utilize a mutually agreed upon expert to review the exempt positions below to ascertain whether said positions shall remain exempt:

Chief Operator of Police Alarm
Police Alarm Operator
Supervisor Police Radio Shop
Police Electronic Technician
Administrative Lieutenant of Detectives
Chief Document Examiner
Document Examiner
Identification Technician
Custodian of Police Property and Stores
Assistant Custodian of Police Property and Stores
Administrative Police Sergeant
Police Audio Visual Specialist
Designate of Chief in Legal Matters
Lieutenant of Police (Garage)
Police Sergeant (Garage)
Traffic Court Coordinating Officer
Narcotics Control Officer
Chief Operator of Police Data Communications
Supervisor of Detective Bureau Administration

32. In all cases where the FPC concludes that a position shall continue as exempt, the FPC shall review the position with the expert and make any modifications in qualifications deemed appropriate to insure the job-relatedness of the qualifications for such position. Thereafter, the FPC shall approve as appointments only persons possessing such qualifications.

33. With respect to individual relief, the FPC shall within sixty (60) days of the Court's approval of this Consent Order adopt a rule with respect to the filling of the above positions remaining exempt. Such rule shall provide that those black officers with MPD service dates of January 1, 1982, or earlier, who at the time of the vacancy qualify for each vacant position shall be placed in a Consent Order Pool to

be eligible for appointment. Those in the Consent Order Pool shall receive priority appointment, provided that during the life of this Order, the FPC will not be required to fill more than twenty-five (25%) per cent of its exempt appointment vacancies from among officers who qualify under this paragraph. This appointment procedure shall cease when the proportion of black officers overall in such exempt positions equals the proportion of black officers in the MPD on November 20, 1982.

## DEPARTMENTAL ASSIGNMENTS

### Tactical Enforcement Unit

34. All officers seeking assignment to the Tactical Enforcement Unit ("T.E.U.") shall hereafter apply in writing to their District Commander. Any such request by an individual officer shall be limited to one (1) application per one-year period.

Officers shall be considered for assignment to the T.E.U. based upon their interest in and qualification for such assignment, as determined by the recommendation of their commanding officer. In evaluating each applicant, the commanding officer shall prepare a T.E.U. screening form setting forth the basis for her or his recommendations. All such forms shall be retained by the MPD for two (2) years. Any officer recommended for such assignment shall be placed in a pool of qualified officers, and shall continue to be eligible for assignment to the T.E.U. for a period of two (2) years without the need for submitting a new application.

35. Those officers who qualify for assignment to the T.E.U. by virtue of the recommendation of their commanding officer shall be further evaluated for assignment by the T.E.U. in accordance with criteria approved by the Chief of Police.

36. With respect to individual relief, within twenty (20) days of the entry of this Order, the MPD shall notify all black officers with MPD service dates of January 1, 1980, or earlier and inform them in writing of their opportunity within thirty (30) days to be considered for immediate assignment to the T.E.U. As to those black officers who respond by submitting timely applications, their commanding officers shall within ten (10) days complete the T.E.U. screening form to establish the officers' qualifications for assignment. From among those black officers recommended for T.E.U. assignment, two (2) such officers shall be assigned to fill the next two (2) vacancies in the T.E.U. The balance of those black officers recommended for T.E.U. assignment shall be placed in the pool of qualified officers from which subsequent assignments shall be made, and shall be subject to the two-year application renewal requirement as set forth in paragraph 34 above.

There shall be a minimum of two (2) additional assignments of qualified black officers to the T.E.U. in each of the next two (2) years. Thereafter, qualified black police officers shall be assigned to the T.E.U. vacancies in numbers approximating their interest in and ability to qualify for such assignments.

### Geographic Police Districts

37. The parties agree that black officers shall hereafter be assigned to the Second and Sixth Districts of the MPD. A minimum of two (2) black officers shall be immediately transferred to each of said districts and assigned to the same shift. Only volunteers will be considered for transfer in order to meet this requirement. However, the Chief of Police shall not be obligated to transfer any such volunteers in meeting this requirement. In addition, a minimum of four (4) black officers shall be assigned to each of the said districts and assigned to the same shift within approximately one (1) year of the entry of this Order.

Other than the assignments agreed to herein, the Chief of Police shall maintain discretion in making assignments to the Second and Sixth Districts.

### Bureaus

38. The parties agree that a black shall be assigned or appointed to the next police officer, sergeant, or detective position in each of the following bureaus within the

MPD: Administration Bureau, Bureau of Identification, Vehicle Service Bureau, Communications Bureau, and the Police Academy. With respect to the position at the Police Academy, said position shall be in an instructional capacity.

## APPLICATION/POSTING

39. With respect to all police officer assignments to the Youth Aide Bureau, the Sexual Assault Unit of the Vice Squad, the Warrant Squad, the Senior Citizen Assault Unit, Tactical Enforcement Unit, and to those bureaus included in the *DEPARTMENTAL ASSIGNMENTS, bureaus* section of this order, the Chief of Police shall by order or memorandum state whether interest in the assignment is one of the criteria, and shall further state how officers may express their interest in the assignment. In addition, the Chief of Police shall by order or memorandum state all criteria, including, but not limited to, investigative ability, departmental activity, report writing, or demonstrated initiative, that are actually utilized in the selection of an officer for an assignment. No other criteria shall be considered.

The parties recognize that in certain circumstances officers on limited duty status will be given the assignments listed above without regard to the criteria indicated above.

40. As vacancies arise for police officers in the bureaus and units cited in paragraph 39 above, and as to any exempt vacancy under paragraph 31, the MPD shall post at bureaus and districts notice of said vacancies.

41. The Chief of Police shall review the criteria for the special district assignments under the control of the district commanders, and shall by order state which of the criteria mentioned above are to be considered by the district commanders in making such assignment. No other criteria shall be considered.

All district special assignments shall be reviewed by the district commander at least once every three (3) months. No such assignment shall be continued beyond the three (3) month period absent special individual circumstances which would suggest that such assignment should continue for a longer period.

## RECORDKEEPING AND REPORTING

42. The defendants shall retain for a period of five (5) years all records relating to the assignment and promotion of officers covered by this Order, including district daily duty rosters, job announcement bulletins, applications, evaluations, eligibility lists, ranking and scores on components of assignment and promotion procedures, and criteria for assignment and promotion. Counsel for plaintiffs shall have the right to inspect any and all such documents upon reasonable notice to the City Attorney without further order of this Court. In addition, the defendants shall make available to plaintiffs' counsel such information or records as plaintiffs request in writing, provided such requests shall not be unduly burdensome.

The defendants shall also make available to plaintiffs' counsel copies of all chief disciplinary departmental orders respecting suspension, demotion, or dismissal, and as to those officers, indicate race, sex, and national origin.

43. For purpose of this Order, reporting periods shall run from January 1 through June 30 and from July 1 through December 31 for each year. With the exception of the information specifically provided pursuant to paragraph 9 above, within thirty (30) days after the close of each reporting period, the City shall provide counsel for the plaintiffs:

(1) The number of officers by race, sex, and national origin, applying for (1) all promotional positions, indicating the position sought, and (2) assignments to those bureaus and units covered by paragraphs 34, 35, 36, and 38 of this Order during the reporting period.

(b) Copies of each eligibility list established for all promotional positions during the reporting period, with officers

identified by race, sex, and national origin.

(c) A listing of all officers, by race, sex, and national origin, who passed or failed each segment of the selection procedure for all promotional positions, indicating each officer's score or ranking on each segment, with officers identified by race, sex, and national origin.

(d) The number of officers by race, sex, and national origin (1) appointed to each promotional position, (2) assigned to each bureau and unit in paragraphs 34, 35, 36, and 38, and (3) assigned to each of the police geographic districts for the reporting period.

(e) The total number of persons, by race, sex and national origin, in (1) the entry level and each promotional position within the MPD's sworn ranks and (2) each geographic district and bureau or unit in paragraphs 34, 35, 36, and 38 as of the close of the reporting period.

(f) The number of terminations by race, sex, and national origin, indicating whether each termination was voluntary or involuntary.

44. The City shall also provide to the plaintiffs within forty-five (45) days of the entry of this Order, a report showing the number of officers, by race, sex, and national origin (1) in the entry level and each promotional position, (2) in each bureau or unit in paragraphs 34, 35, 36, and 38, and (3) in each geographic police district as of the date of the entry of this Order.

45. The recordkeeping and reporting requirements under this Order supersede all recordkeeping and reporting requirements heretofore provided under Civil Action File No. 74–C–480, or under agreement with the Office of Revenue Sharing.

## COMPENSATORY RELIEF FUND

46. Within ten (10) days of Court approval of this order, defendant City shall set aside the amount of Ninety-Nine Thousand ($99,000) Dollars in an interest bearing account.

Within thirty (30) days of executing this Order, attorneys for the plaintiff class and defendants shall exchange lists of all known claims of class members based upon race discrimination in promotion, assignment, and transfer practices through the date of execution of this Order. Based upon these known claims, the plaintiff class shall furnish defendants' counsel with a release of claim, in a form approved by defendants' counsel, for each and every claim identified by the parties. Plaintiffs' counsel shall also provide defendants' counsel with a release on behalf of the class releasing all class claims based upon race discrimination in promotion, transfer, and assignment through the date of the execution of this Consent Order.

Upon receipt of the aforementioned releases, the defendants shall deliver the Ninety-Nine Thousand ($99,000) Dollars check to Perry, First, Reiher, Lerner & Quindel, S.C., Class Action 81–C–1465 Trust Account, along with accrued interest, for distribution by attorneys for plaintiff class pursuant to the schedule set forth in Appendix A attached to this Order.

## MISCELLANEOUS

47. This Consent Order does not include any provision for resolution of that portion of the claims of Ronnie Horton and Lenard Wells alleging retaliation and discrimination with respect to disciplinary actions ordered by defendant Chief Breier which are inchoate by virtue of a preliminary injunction enjoining such discipline.

Neither does this Consent Order resolve issues of discrimination/retaliation arising out of the terminations of Earl Ridgway, David Clarke, and Brian Suttle.

48. The parties shall resolve disputes arising under this Consent Order among themselves. Any party seeking a resolution of any issue shall extend a proposal for such resolution to the other parties. If a resolution has not been reached within forty-five (45) days, any party may petition the Court for appropriate relief. The parties agree that for any disputes arising under paragraphs 1, 4, and 5 above which cannot be resolved among the parties, the

**1036**

party petitioning the Court shall proceed by a motion for supplemental relief.

49. This Court shall retain jurisdiction of the matters covered by this order for a period of five (5) years from the date of entry for such further action as may be necessary or appropriate to effectuate the purposes of this Consent Order. At the end of five (5) years, this Order shall dissolve, provided that plaintiffs may move to oppose dissolution of the Order, in whole or in part, for good cause shown, including consideration of the degree to which the objectives of the Order have been achieved.

## APPENDIX A

### Compensatory Distribution

There shall be three (3) schedules established among which the compensatory fund shall be distributed. Class members shall be placed on these schedules if they meet the definitions set forth below. A class member may be eligible for inclusion in more than one (1) schedule and may claim shares from every schedule for which she or he qualifies.

Each class member who wishes to participate in the compensatory distribution shall be required to complete and submit a claim form no later than a date sixty (60) days following the approval of this order. *Failure to comply with this requirement shall constitute a waiver and relinquishment of any and all claims for compensatory relief on the basis of the allegations of the complaint in this case.*

### Residual Fund

The residual fund is the amount of money remaining in the fund after all fixed shares have been distributed. It is further anticipated that all administrative costs associated with distribution of the residual fund shall be deducted from the residual fund before said fund is distributed to class members. Administrative costs shall be actual costs to administer the fund, but in no event shall exceed four (4%) percent of the residual fund.

### Schedule I (Named plaintiffs)

The originally named plaintiffs in Civil Action File 81–C–1465 whose activity fostered prosecution in this action and who alleged racial discrimination shall each receive a fixed share of Two Thousand ($2,000) Dollars:

Arthur Jones
Bobbie Durrah
Lenard Wells
Ronnie Horton
Brian Suttle
Dorothy Downing

### Schedule II (Individual Claims)

A. Retaliatory Transfers. The following officers shall receive fixed shares in settlement of their claims as compensatory nonpunitive damages for injuries involving their involuntary transfers in November, 1981, which were the subject of the May 1982 preliminary injunctive decision by the Court:

| | |
|---|---|
| Bobbie Durrah | $4,000 |
| Lenard Wells | $4,000 |
| Ronnie Horton | $4,000 |
| Brian Suttle | $4,000 |
| Lawrence Morris | $4,000 |
| Arthur Jones | $2,000 |
| Philip Parker | $1,000 |
| Isaac Sawyer | $1,000 |

B. A fixed share of Five Thousand ($5,000) Dollars to Earl Marshall in settlement of his outstanding EEOC charge and claim for compensatory non-punitive damages.

C. In the event that Arthur Jones does not pass the next Lieutenant of Detectives examination, he shall be entitled to receive, as a fixed share, the amount set forth in paragraph 30 of this Order. Said amount, upon transfer to this fund, shall constitute compensatory, nonpunitive damages for personal injuries with respect to the facts set forth in his EEOC charges.

### Schedule III (Promotion/Assignment Class Claims)

After the fixed shares in Schedules I and II above have been paid (with the exception

of Arthur Jones' contingent interest), the residual fund remains. Each member of the plaintiff class who, as of November 19, 1975, was employed by the MPD as an officer shall be entitled to claim shares of the residual fund on the following basis:

one (1) unit of the fund for each year of service with the MPD up to a maximum of fifteen (15) units.

The residual fund will be divided into units. The value of each unit shall be determined by the value of the fund. These sums shall be distributed to class members in settlement of their claims for compensatory, non-punitive damages.